[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a fully contested custody matter between unmarried parents of a minor child, Michael Smyrski, born November 9, 1994. The plaintiff is the father of the minor child and the defendant is the mother of the minor child.
The child has a history of a complicated delivery with a resultant right brachial plexopathy, multiple cranial fractures and a facial nerve paresis. As of November 9, 1994, he had made tremendous progress overall, was ambulating independently and was completely functional with the left upper extremity.
The plaintiff initially filed suit seeking an order of joint custody of the minor child and specific visitation schedule. CT Page 5712
Prior to, or on or about February 15, 1997, the defendant arranged for the child to have all of the various therapy treatments that were required. On or about February 15, 1997, the therapist commenced going to the plaintiff's residence once a month. Up until the time the child was one year old, he attended a birth to three therapy program twice a week. The plaintiff never brought him to that therapy during that period of time. The child continues to receive speech therapy, occupational therapy and developmental therapy that are all part of the birth to three program.
The defendant is a paranoid schizophrenic and is under medication for that condition. The plaintiff has been treated for her paranoid schizophrenic condition for ten years.
After the child was born, the defendant assisted the child with arm stretches three times daily until professional therapy started. Professional therapy started approximately two to three months after the child was born, at which time the defendant was involved in less therapy treatment directly with the child. The child continues to have a problem of a weak wrist with his hand turning over and problems with his shoulder. As of April 3, 1997, he was seeing four therapists at the defendant's residence. One was a developmental therapist, and three therapists were part of the birth to three program.
The parties initially entered into an agreement on July 24, 1995, coded No. 103, that was approved by the court on July 24, 1995. That agreement provided as follows:
 The parties agree to joint legal custody of the minor child; the defendant to be the residential parent. The plaintiff shall have visitation with the minor child, Michael Smyrski, born 11/9/94 as follows: For eight weeks from 7/24/95, visitation shall be from Saturday morning at 10:00 a.m. through 10:00 a.m. Sunday every week. Visitation shall also be every Tuesday evening from 5:30 p. m. to 8:00 p. m. After 8 weeks from 7/24/95, weekend visitations shall increase to Friday 7:00 p. m. to Sunday 10:00 a.m., the Tuesday evening visitation continuing unchanged.
 The plaintiff shall pick up and drop off the minor child at the defendant's door, and shall not enter defendant's apartment. The plaintiff shall call to speak with the defendant within 24 hours of every visitation to confirm visitation and discuss issues regarding the CT Page 5713 child. The defendant shall not telephone the plaintiff except for emergencies concerning the minor child. If either parent intends to relocate outside of the greater Danbury area, he/she shall give the other 60 day advance written notice.
The plaintiff filed a motion for modification of visitation coded No. 104, dated October 4, 1995, and filed stamped November 1, 1995. The plaintiff filed a motion for a restraining order dated October 4, 1995, file stamped October 16, 1995, and coded No. 104.50 seeking the court to enter an order that neither party remove the minor child from the State of Connecticut for longer than three successive weeks. The plaintiff filed a motion for contempt dated November 21, 1995, file stamped December 1, 1995, and coded No. 106 alleging that the defendant was in violation of the court order regarding telephone communication between the plaintiff and the defendant. The plaintiff filed a motion for modification of visitation dated November 21, 1995, file stamped December 12, 1995, coded No. 107. The parties entered into an agreement dated January 2, 1996, coded No. 109, which was approved by the court on January 2, 1996. That agreement provided as follows:
 The previous COURT ORDER DATED 7/24/95 SHALL BE MODIFIED AS FOLLOWS: The parties hereto shall have no telephone contact whatsoever. In case of emergency, the parties agree to notify the Defendant's mother, Marie Laskowski who shall inform the other party of the situation.
 The Plaintiff shall have visitation with the minor child Michael Smyrski, Jr. each Tuesday evening from 5:30 p. m. through 8:00 p. m. and each weekend from Friday evening at 6:00 p. m. through Sunday at 11:00 a.m.
 In all other respects, the previous court order shall remain in effect except that the Plaintiff's Motion for Modification of Visitation is referred to F.R. for a study.
The defendant filed a motion for order dated January 10, 1996, file stamped January 10, 1996, coded No. 111 seeking to vacation with the minor child for a period of three weeks in Florida. On April 15, 1996, the parties entered into a stipulation that was approved by the court on April 15, 1996. That stipulation provided as follows:
1. The weekly visitation between the Plaintiff and the minor CT Page 5714 child shall be modified in accordance with the following schedule:
A. Thursday from 5:00 p. m. to Sunday at 11:00 a.m.
 B. The Plaintiff shall be kept informed of all significant medical, educational and welfare issues.
2. All other prior orders shall remain in effect.
On August 7, 1996, the plaintiff was ordered to participate in parent education classes. He successfully completed that program on October 2, 1996. On August 7, 1996, the defendant was ordered to participate in parent education classes. An order was entered on November 13, 1996, requiring the defendant to participate in parent education classes and waiving fees which replaced the prior order entered. The defendant successfully completed parent education classes on March 5, 1997. The matter came before the court on August 7, 1996, as an uncontested hearing. The parties reported that the matter was no longer settled, and Attorney Julie I. Foster was appointed to represent the minor child for the purposes of custody, support, education and visitation only. On November 12, 1996, the parties entered into a stipulation that was approved by the court on November 12, 1996. That stipulation provided as follows:
 1. The parties agree that they desire to remain the joint legal custodians of the minor child. The primary residence of the minor child shall be with the defendant.
The weekly visitation between the plaintiff and the minor child shall be in accordance with the following schedule:
 a. Thursday from 5:00 p. m. until Sunday 11:00 a.m.;
b. Alternate holidays;
c. Two weeks vacation per year.
 2. The Plaintiff shall pay to the defendant the sum of Ninety ($90.00) Dollars per week for the support of the minor child until he attains the age of eighteen (18) or graduates high school, whichever last occurs but in no CT Page 5715 event beyond the age of nineteen (19).
 3. The parties further agree that the parties shall have no telephone contact whatsoever. In case of an emergency, the parties agree to notify the defendant's mother, Maria Laskowski who shall inform the other party of the situation.
The Plaintiff shall be kept informed of all significant medical, educational and welfare issues involving the issues involving the minor child.
 4. The Plaintiff shall maintain health insurance for the minor child as provided as a benefit of his employment and the plaintiff and the defendant shall share equally all unreimbursed expenses incurred for the benefit of the minor child.
 5. The Plaintiff shall be entitled to claim the minor child as a dependent for all tax purposes, until such time as the defendant is employed on a full time basis (at least 35 hours per week). It is the understanding of the parties that the defendant will not be disqualified from claiming the Earned Income Tax Credit because the plaintiff is claiming the minor child as a dependent for tax purposes. Notwithstanding the foregoing, the parties agree that in the event, and only in the event, that the defendant would be disqualified from claiming the earned income credit as a result of not claiming the minor child as a dependent on her federal and/or state income tax returns, then in that event, she shall be entitled to claim the minor child as a dependent on her tax returns and shall so notify the plaintiff in writing.
The court further ordered on November 13, 1996, that the attorney's fee for counsel for the minor child was initially set at $500 and that $250 had already been paid by the plaintiff. The court ordered the defendant to pay $250 in accordance with a schedule that was ordered. The plaintiff filed a motion for modification of custody and visitation orders dated January 14, 1997, and file stamped January 24, 1997, and coded No. 127 seeking sole custody of the minor child. The plaintiff's motion for modification of custody and visitation dated January 14, 1997, sought to have ex parte orders entered in accordance with that motion, which was denied. The motion was assigned for CT Page 5716 hearing for January 27, 1997. The court has held hearing dates on the issues of custody and visitation, and other related motions on the following dates: February 13, 1997, February 14, 1997, February 25, 1997, February 26, 1997, March 11, 1997, March 12, 1997, March 17, 1997, April 3, 1997, April 18, 1997, October 20, 1997, December 17, 1997, December 18, 1997, February 11, 1998, and with final argument on February 27, 1998. The plaintiff filed a motion for appointment of guardian ad litem dated February 10, 1997, file stamped February 11, 1997, coded No. 129, as a result of a lawsuit that was filed on behalf of the minor child arising out of injuries sustained by the child at birth. The plaintiff filed a motion for order dated February 10, 1997, file stamped February 11, 1997, coded No. 130 requesting that he be appointed as a person to make decisions for the minor child in the minor child's pending medical malpractice lawsuit. On February 24, 1997, this matter was referred to Family Services on the issues of custody and visitation for study with that referral continued to June 16, 1997, at 2 p. m. The plaintiff filed a motion for contempt dated August 4, 1997, file stamped August 4, 1997, and coded No. 138 arising out of the stipulation approved by the court on November 13, 1996. Counsel for the minor child filed a motion for contempt against the defendant arising out of the stipulation approved by the court on November 13, 1996 and April 18, 1997. On August 25, 1997, the court found the defendant in contempt arising out of the plaintiff's motion coded No. 138 and suspended the defendant's visitation until November 9, 1997, and ordered that the defendant return the minor child to the plaintiff on August 25, 1997. The court also retained jurisdiction for any visitation and/or custody motions or any § 46b-15 motions filed by either party. On August 26, 1997, the plaintiff filed a motion to modify orders file stamped August 26, 1997, coded No. 141. That motion sought an order that the order entered on August 25, 1997, be modified to allow the Danbury Police Department or a Fairfield County Sheriff or the person access to the minor child immediately, and to hold the defendant in contempt. The plaintiff filed a third motion for contempt dated August 27, 1997, file stamped August 27, 1997, coded No. 142. The plaintiff filed a motion to modify orders per contempt dated August 27, 1997, file stamped August 27, 1997, and coded No. 143. The defendant filed a motion to modify requesting the court to modify its order entered on August 25, 1997, in which her visitation rights were suspended until November 9, 1997, to allow her to visit with the minor child. That motion is coded No. 145 and was file stamped September 24, 1997. The plaintiff filed a motion for referral to Family Services for CT Page 5717 updating the evaluation dated September 30, 1997, file stamped October 1, 1997, and coded No. 146. On October 14, 1997, the court referred the matter to Family Services on the issues of custody and visitation for a study update limited to contempt and in-patient records. This court entered an order dated October 28, 1997, coded No. 148 denying the plaintiff's motion for contempt coded No. 141 and plaintiff's motion for contempt coded No. 142, with no counsel fees awarded to either party. The order further provided as follows:
 2. The existing order regarding the period of time the child is to be with the defendant is temporarily modified. The child is to be with the defendant on Wednesday, Thursday, Saturday and Sunday of each week from 9 a.m. to 1 p. m. Pick-up and drop-off of the child is to occur at the Burger King on Federal Road in Brookfield, Connecticut. The plaintiff is to make arrangements for someone other than himself for drop-off and pick-up of the child. Section 479 of the Practice Book is applicable to this order and it is subject to modification upon the filing of the updated Family Relations' report without having to show a substantial change in circumstances. This order is effective commencing November 1, 1997.
 3. Visitation is not to be at the defendant's residence or the residence of any other person. Visitation is to take place in a public place.
The court finds the following additional facts.
The police have been involved in many instances regarding the defendant. Most of the police involvement was as a result of a relationship between the defendant and Barry Profeta.
1. On August 25, 1996, the plaintiff called the police, as a result of which, Barry Profeta was charged with assault in the third degree, § 53a-61. On August 27, 1996, the defendant filed a statement with the Danbury Police Department that she did not want the sexual assault complaint against Barry Profeta pursued, but wanted him to go to court for domestic violence.
2. On October 9, 1996, a warrant was issued for the arrest of Barry Profeta for violation of a protective order. The defendant told police that at one point, Profeta became verbally abusive to her and spit in her face and, in fear for the safety of her son and herself, she grabbed the phone to call the police. CT Page 5718
3. On October 28, 1996, the police investigated a domestic dispute at the defendant's residence. The defendant informed the police that she was Profeta's girlfriend of three months and that he was currently staying with her. She stated that when he came home that evening he was intoxicated and they argued, that he slapped her in the face and said he was going to kill her. As a result of that incident, Profeta was arrested for violation of a protective order.
4. On December 4, 1996, the Danbury police were again called by the defendant to her residence in which she related that her live-in boyfriend, Barry Profeta, had again grabbed her and hit her.
5. On December 5, 1996, the Danbury police were called by the defendant to her apartment on a domestic assault incident in which she related that she allowed Profeta into her apartment and that he had struck her. A family violence protective order had been entered on October 28, 1996, ordering Barry Profeta not to impose any restraint on the defendant, not to assault her, and not to enter her residence. Notwithstanding that protective order, the defendant voluntarily allowed Profeta into her residence.
6. On December 7, 1996, the Danbury police were called to the defendant's residence for another domestic violence complaint. The defendant stated that she wanted to be taken to see a doctor and further stated that she had been arguing with her boyfriend, and that when she asked him to leave, he did. She further stated that she had approximately one gram of cocaine on December 6, 1996. When the police arrived at her home, Barry Profeta was not present and her son was not present.
7. On December 15, 1996, the Danbury police investigated another domestic disturbance at the defendant's residence. The plaintiff was present at the scene of this incident. He related that he called the police because the defendant was upset and having just been involved with a fight with her boyfriend and he did not want to leave the child with her in her upset condition. The defendant related that she had let Profeta back into her apartment the previous evening and that he spent the night with her. They then started to argue in the morning. The defendant had a small cut on her lip area where Profeta had punched her. The plaintiff agreed that he would leave the child with the defendant CT Page 5719 as long as Profeta would not be around. As a result of the December 15, 1996 incident, Profeta was charged with assault in the third degree.
8. On January 3, 1997, the Danbury police again were called to the defendant's residence for a domestic dispute. The defendant told police that her boyfriend, Barry Profeta, came to her apartment that evening and broke in and held her down against her will. Profeta stated that he would kill her if she called the police. When the police arrived, Profeta had already left.
9. On January 4, 1997, the Danbury police were again called to the defendant's residence. The defendant related that her home had been broken into the previous evening by her ex-boyfriend, Barry Profeta, while she was out. Profeta was located and charged with violation of a protective order, and was further arrested for two prior warrants for assault third, and for criminal mischief in the third degree, and for two violation of probation orders.
10. On January 29, 1997, the police were again called to the defendant's residence. She related that on January 28, 1997, she had received a letter in the mail from Barry Profeta, her ex-boyfriend. She stated that she had a protective order against him and that he was to have no contact with her. She stated that he had written to her from the Corrigan Correctional Institute where he was incarcerated, and that she did not want to have any contact with him and wanted him arrested.
11. On March 31, 1997, the Danbury police were again called to the defendant's residence for a domestic dispute. The dispute was between the defendant and her mother. The parties had been arguing and the defendant had thrown coffee on the floor and had also thrown an ashtray on the floor. Both parties were charged with disorderly conduct.
The Department of Children and Families ("DCF") has also been involved with the parties. On May 26, 1995, DCF wrote to the plaintiff informing him that it had concluded its investigation into the report made and had substantiated emotional neglect. The case was transferred to the protective services unit of DCF. As of the date of the letter of May 26, 1995, the minor child, Michael Smyrski who was born on November 9, 1994, was approximately six and one half months old. On July 25, 1996, DCF wrote a report regarding "suspected child abuse." The explanation CT Page 5720 of the suspected abuse was as follows:
 This is above-named child's 2nd minor head trauma within approx. the last 8 days. Child's mother states he fell down 2 cement steps hit his left forehead. Child brought to hospital by child's father, Michael Smyrski. He was admitted to our observation unit overnight. This reporter was asked to investigate situations and determine if adequate support systems are in place in the mother's home. Mother has a long history of psychiatric problems (DX: Paranoid Schizophrenia) but has a caseworker in the community through Catholic Family Services participates in the Community Psychiatric Center's program with Dr. Milantano. Mother became extremely agitated angry. Mother was unable to calm down. Speech was pressured fast. She expressed some paranoid thinking ("Someone is accusing me of messing up my baby's food!") Mother did call her mental health counselor for assistance at that time. Child's pediatrician, Dr. Kogekar, this reporter are concerned that mother's emotional state is unstable she may not be able to provide consistent appropriate care or protect him from harm at this time. We are not comfortable discharging child to his mother at this time. Mother did agree to discharging child to his father this evening.
The Department of Children and Families contacted the child's pediatrician, Dr. Cohn, on January 8, 1997. Dr. Cohn had no concerns regarding abuse or neglect of the child. The court finds that there has been no physical abuse by the defendant to the child.
On January 17, 1997, DCF entered into a service agreement with the defendant. The terms of that agreement were as follows:
 1. Lori Weber will honor the terms of the full protective order in effect against Barry Profeta, and will refrain from initiating any contact with Barry Profeta while the protective order is in effect. Lori Weber will contact the Danbury Police Department if Barry Profeta appears at her residence in violation of the protective order. Lori Weber will report to the State's Attorney's office any attempt to contact her by telephone, letter, or indirect method made by Barry Profeta while the protective order is in effect.
 2. Lori Weber will not permit Barry Profeta to reside in her home until he has completed an in-patient substance abuse treatment program and/or a similar program recommended by a drug/alcohol counseling provider.
CT Page 5721
 3. Lori Weber will comply with any treatment recommendations made by MCCA for drug/alcohol treatment.
 4. Lori Weber will continue using the services of Dr. Milantano, Case Management, Catholic Family Services, and physical therapy for her son, and will comply with the recommendations of DCF and any service provider involved with her family.
 5. If Lori Weber agrees to and complies with the above-stated terms of this agreement, DCF will not initiate a juvenile court action against Lori Weber.
 6. If DCF receives another report alleging abuse/neglect of Michael Smyrski by Lori Weber, and that report is substantiated, this agreement becomes null and void, and DCF will reconsider initiating a juvenile court action against Lori Weber.
The Department of Children and Families filed a neglect petition in this case in April, 1997, but later withdrew it. That is the only neglect petition filed by the Department of Children and Families in this case. The defendant has been seen by DCF employees approximately ten times in the presence of the minor child. She has always acted appropriately on each of those occasions up to August, 1997. The Department of Children and Families further found that all of the child's basic needs have been met by the defendant. Whenever there is a DCF open case and thereafter domestic violence occurs, the investigator must recommend that a neglect petition be filed. This policy is not in writing.
Family Relations had completed a study in this matter on July 16, 1997, and an updated study on December 16, 1997. The court finds the following facts from the July 16, 1997 study.
FAMILY ASSESSMENT
 The parents and child have been involved with various community agencies during the last several years. The mother has been a mental health client of the Case Management Program affiliated with Catholic Family Services since 1990. Her case managers, Carol Zara and Sandra Cole, report that Ms. Weber continues to be cooperative with the program and compliant with treatment recommendations. Ms. Weber is seen for outpatient psychiatric treatment by Dr. Salvatore Milatano. She currently is CT Page 5722 prescribed Paxil and Tranxene and is reported to be treatment compliant. Dr. Milatano indicated that he believes that Ms. Weber's psychiatric condition does not interfere with her parenting abilities and related that he has observed the mother to be adequately meeting the child's needs. When observed during the home visit, Ms. Weber appeared to be adequately taking care of the child's needs, interacted appropriately with Michael, and was attentive to his safety needs.
 The Department of Children and Families has been involved with this family since the child's birth. In January of this year, the Department of Children and Families filed neglect petitions against the mother. The mother participated in a substance abuse education program based on the mother's admitted use of cocaine with her former boyfriend. On May 31, 1997, the mother completed the program.
 The Department of Children and Families was first assigned to the family on August 9, 1996. The Case Worker, John Bishop visits with the mother and child once or twice a month at the mother's home. The mother has been referred to DCF on eight occasions, with six of the reports being substantiated by the department. The initial reports centered around the child possibly being physically at risk through inattention on the mother's part, but Mr. Bishop has indicated that the Department's concerns in this area are minimal at present.
 More recently, DCF received a report on January 4, 1997 of domestic violence on the part of the mother's boyfriend at the time, Barry v Profeta, against the mother. DCF was concerned that the mother had allowed Mr. Profeta back into her home after being physically assaulted by Mr. Profeta. Additionally, on April 3, 1997, Linda Piascik of Family Services, reported to DCF that the mother had been arrested for Disorderly Conduct after engaging in a heated verbal altercation in the presence of the child. DCF was concerned about the mother's judgment in exposing the child to verbal and physical domestic abuse. In response, DCF filed neglect petitions in Juvenile Court on the basis of the mother's poor judgment in repeatedly permitting Mr. Profeta back into her home and in engaging in a heated altercation with him in the presence of the child.
 DCF did indicate, however, that the mother has maintained regular physical, occupational, and speech therapy for her son, and has seen her psychiatrist and her psychotherapist on a regular basis. CT Page 5723 In addition, she has worked on a long-term basis with the Case Management Program affiliated with Catholic Family Services. The Department indicted that they do not have grounds to remove the child from the mother's care in accordance with state statutes, and the mother is clearly meeting all of the child's basic needs. Mr. Bishop further indicated that the biggest risk factor in the child's life is the continually acrimonious relationship between the families of his parents. Mr. Bishop noted that he believes that the parents need to learn to maintain a civil relationship despite the negative influences of their parents, or the child will have trouble developing trusting relationships later in life. Mr. Bishop noted that the father and the paternal grandmother have been responsible for five of the eight reports made to DCF, and the paternal grandmother has called the Department to complain about the mother's care of the child, reporting concerns about diaper rash and smoke in the child's clothes.
 On June 24, a hearing was held in Juvenile Court. The parents entered denials at that time. The mother agreed to participate in a psychiatric evaluation. DCF has indicated that if the mother complies with treatment and recommendations, that on the next court date of August 21, 1997, when the family is due back in Juvenile Court for a case status conference, DCF will likely drop the neglect petitions. Since one of the father's concerns was the mother's relationship with her former boyfriend, an inquiry was made to the State's Attorneys Office in the Danbury Superior Court. Mr. John Mahoney indicated that the mother has been cooperative in the State's prosecution of the case. The mother's references indicated that they have observed the mother to be a loving, attentive, involved mother who except in the case of the mother's involvement with her previous boyfriend, has been very sensitive to her child's needs.
 Ms. Weber currently resides in Danbury in a two bedroom rented apartment. She presently is unemployed and supports herself with the state assistance she receives. She impresses one as a devoted mother who appears to be overwhelmed at times with the demands of being a single parent of a special needs child. However, it is evident that she cares a great deal about her child and is consistently available for his many appointments with the physical therapist, speech therapist, pediatrician and play group. At times, the mother can be volatile and unfocused. For example, at the beginning of one interview with the mother, she began the interview by telling this writer about an experience she had that morning at her bank in which she was not given all of the money she was supposed to CT Page 5724 receive during a bank transaction.
* * *
 Mr. Smyrski resides with his parents in their three bedroom home in New Milford. He has been employed as a Drafter at Rapid Power Technologies since November of 1994. He presents as a caring, concerned father who genuinely would like the best parenting arrangements for his child. This writer shares the father's concerns about the mother's judgment in allowing her boyfriend to move in with her even though she had only known him for a short time. In addition, the father's concerns about the mother's prior use of cocaine is concerning to this writer.
 When observed during the home visit, the father appeared to be comfortable taking care of the child. When this writer arrived for the father's home visit, the child had just awakened from a nap. Noteworthy to the father's home visit was the fact that the father allowed the child to awaken slowly, not rushing the child to interact with the family or with this writer.
 The paternal grandmother was a dominant presence during the visit, albeit supportive of her son and concerned about her grandson's welfare. The paternal grandfather was also present during the home visit and seemed comfortable relating to the child. He appeared to enjoy the visit with the child and provided a calm, supportive influence in the household. The father's references indicated that they have observed him to be a caring, concerned, and an involved father.
 In a report received from Ms. Fran Rosato, the Parent Educator who runs the parent-child play group which Michael participated in since March of this year, Ms. Rosato noted that Michael has become very comfortable with the group and displays appropriate behaviors. She indicated that Michael plays well with the other children and accepts correction reasonably well. He reportedly comes to the group neatly dressed and well groomed. His relationship with his mother, as observed by Ms. Rosato, appears to be good. She noted that there are times when the mother appears to be a little unsure about how to get Michael to follow her direction but that this has not been a major problem. She indicated that the mother could definitely benefit from continuing to access supportive services as Michael gets older and seems to be willing to do whatever she sees is best for Michael.
CT Page 5725
 Two and a half year old Michael was born with a forceps delivery and sustained an injury to his right arm during delivery. He presently receives physical therapy to increase the strength in his arm. In addition, the child is speech delayed and receives speech therapy.
 The child's pediatrician, Dr. Bruce Cohen, indicated that the child's immunizations are current and that the child has had no serious illnesses. He indicated that the child's mother brings the child in for his office visits for routine well care and his care appears to be appropriate at this time. Dr. Shapiro of the Children with Special Health Care Needs Program at Danbury Hospital, indicated that Michael has been followed at six-month intervals through the program. He has been diagnosed with Erb's Palsy, developmental delay and possible language delay. His special needs have placed him in the Birth to Three program through which he is receiving physical therapy, occupational therapy, and speech therapy.
 Melinda Macomber, Developmental Therapist of the Early Connections Program, indicated that Michael has been involved with the program since July, 1996, and will likely remain involved until he turns three in November. Through the program, Michael receives speech therapy once a month, occupational therapy twice a month, physical therapy twice a month, and developmental therapy once a week. Ms. Macomber indicated that Michael has made many gains over the past few months. He continues, however, to experience delays in all areas of development with the exception of gross motor. The major areas of concern noted are communication and cognition. Ms. Macomber also indicated that both parents have been involved in the child's treatment, and both parents need to follow through more often with treatment recommendations made by Ms. Macomber.
 Kim Downey, Michael's Physical Therapist, indicated that she has seen Michael a total of five times since February of this year. He is being seen to increase active control of his right upper extremity. There are no major concerns with Michael's gross motor development, however, he continues to demonstrate right upper extremity paralysis.
 Ms. Downey noted that Michael does have some active movement in his right arm and continues to make gradual progress. He is able to use his right arm as a gross motor assist for catching, stabilizing objects, etc. and also to use the fingers of his right hand for manipulating objects, e.g. stacking pegs.
CT Page 5726
The conclusions and recommendations from the July 16, 1997 report were as follows:
CONCLUSION AND RECOMMENDATIONS
 Although the mother has a mental health history, she has been compliant with her psychiatric treatment and psychotherapy and appears to be functioning adequately as a parent. It appears as though these parents have difficulty communicating with each other, although both parents indicated a willingness to endeavor to cooperate with each other for the sake of their child. It was evident that although the parents have experienced frustration in their efforts to resolve their differences concerning their son, both parents have continued to make an effort to work with the other parent. Despite her psychiatric condition, the mother appears to be adequately providing for Michael's primary care needs and his special physical therapy and speech needs. Concern does exist about the mother's judgment in permitting her boyfriend to move in with her, the conflictual nature of the relationship she had with her boyfriend, the mother's admitted use of cocaine with her boyfriend and the impact that the above may have had on the child. The mother was advised that if there are any other problems in her home for which the police need to be called or if she engages in any other activities which put the child at risk that the Family Services Unit would consider making a recommendation that sole custody be granted to the father. For that reason a custody review is recommended.
 Although the mother has been the primary caretaker since Michael's birth, the father has provided a reliable, stable source of support to the mother and has been an involved father. The father appears to be genuine in his expressed concern of Michael's welfare and his desire to continue to play a major role in the child's life. He can also provide a good support system by utilizing his parents.
 It appears that the child would benefit from continuing contact with both parents. Since the father's work schedule limits his availability during the week, and since the mother has historically been available during the week to care for the child and has maintained regular contact with the child's treatment providers, it appears that this arrangement is presently in the child's best interest. The child's treatment providers have indicated that the mother is appropriate in her interactions with the child and has made good use of the resources available to the child. The father CT Page 5727 had indicated that he is interested in becoming more involved in the child's treatment and has been meeting with the child's speech therapist at his parents' home approximately once a month. It would be hoped that the father would continue to meet with the child's speech therapist and that he would maintain contact with the child's other treatment providers.
It is the recommendation of the Family Services Unit that:
 1. The parents be granted shared custody of the child, residing with the father from Wednesdays at 5:00 p. m. until Sundays at 11:00 a.m., and with the mother from Sundays at 11:00 a.m. until Wednesdays at 5:00 p. m.;
2. The parents alternate holidays;
 3. The parents each be allowed one week's vacation with the child (at least two weeks written notice provided to the other parent);
 4. The mother continue with her psychiatric treatment, including taking her prescribed medications; and
 5. This matter be reviewed by the Family Services unit in six months.
The court has also had the benefit of an updated study by Family Services dated December 16, 1997. The court finds the following additional facts from that study.
Background Information
 This updated evaluation involves a custody and visitation dispute between Michael Smyrski and Lori Weber concerning their three old son, Michael Smyrski. The parents were never married. They lived together from 1993 until February of 1995. From November 1996 until August of this year the parents had joint custody with the child's primary residence being with the mother. Since August of this year, the child has been residing with the father and did not visit with the mother until early November of this year.
 Summary of Issues
Ms. Weber asserted that the paternal grandfather had CT Page 5728 sexually molested the child and had taught the child to masturbate. Her concern developed after she observed the child masturbating while he was watching television. The mother also alleged that the child had been taught to say "shut up" by the paternal grandparents. The mother later alleged that the grandmother had slapped the child. The mother is seeking sole custody with the child visiting with the father from Friday evening to Sunday at 9:30 a.m.
 The father claims that the mother has continued to be emotionally unstable and cited the mother's belief that the paternal grandfather had sexually molested the child as one of his concerns about the mother's current mental health. The father had indicated that the mother had terminated the child's visits due to her belief that the child had been molested by the paternal grandfather. The father is seeking sole custody of the child with supervised visitation with the mother.
 Family Assessment
 Thirty-seven year old Lori Weber has been on a Mental Health Social Security Disability since August of 1990. In an interview with Ms. Weber on May 22, 1997, she indicated that her psychiatric diagnosis is Paranoid Schizophrenia. She has resided at her present address in Danbury for over three years. She appears to be a caring, concerned mother but seems to have difficulty exercising good judgment at times due to the paranoid quality of her thinking.
 Ms. Weber was hospitalized at Danbury Hospital on August 28, 1997 following the termination of her visits by the court. When interviewed by Family Services, she indicated that she thought it was the end of the world when her child was taken away. She further indicated that she was having some medical problems at that time due to a car accident in May or June of this year. The mother was discharged from Danbury Hospital on September 16, 1997.
 Ms. Weber has been treated by Dr. Soledad Araya since August of this year on a monthly basis. Ms. Weber was last seen in Dr. Araya's office approximately one and a half weeks ago by a nurse therapist in Dr. Araya's office since Dr. Araya was unavailable. Ms. Weber is presently taking four prescribed medications, two of which are anti-psychotic medications, zyprexa and navane in order to help Ms. Weber organize her CT Page 5729 thoughts. In a conversation with Dr. Araya on December 17, 1997, Dr. Araya indicated that Ms. Weber is treatment compliant with her medications and attends her scheduled appointments with Dr. Araya. Dr. Araya also indicated that the dosages of Ms. Weber's medications may be adjusted in the future.
 Thirty-eight year old Michael Smyrski resides with his parents in their three bedroom home in New Milford. He has been employed as a Drafter at Rapid Power Technologies since November of 1994. He presents as a caring, concerned father who genuinely would like the best parenting arrangements for his child. The father appears to be adequately caring for the child's needs but seems to lack complete confidence in his parenting abilities. He seems to be willing to learn more about parenting his son and helping young Michael with his particular special needs.
 In a report dated October 22, 1997 from Psychiatrist Dr. Paul Fox, Dr. Fox indicated that the father entered treatment on September 24, 1997 to discuss concerns he has about his son, Michael Smyrski. In a telephone conversation with Dr. Fox on October 28, 1997, Dr. Fox indicated that the issues being address by Mr. Smyrski included parenting issues and Mr. Smyrski's relationship with his son's mother. Dr. Fox indicated that parent effectiveness techniques were being addressed and that the father was utilizing specific techniques to help minimize young Michael's aggressive outbursts. Dr. Fox also noted from his observations that Mr. Smyrski appeared to be less angry than Ms. Weber and was concerned about the many 911 telephone calls apparently placed by Ms. Weber.
 Three year old Michael was born by forceps delivery and sustained an injury to his right arm during delivery. He presently receives physical therapy to increase the strength in his right arm. Further, Michael is delayed in his speech development and receives regular speech therapy.
 In a telephone conversation with the child's pediatrician, Dr. Kavirajan, on October 24, 1997 Dr. Kavirajan indicated that the child is doing well at that time. He did indicate that he has observed some behavioral problems, specifically, he has resisted doing what he is told and has used inappropriate language. The issue of whether or not the child was sexually molested was also addressed with Dr. Kavirajan. Dr. Kavirajan indicated that he CT Page 5730 had not observed any evidence to indicate that the child had been sexually molested.
 In a telephone conversation on October 24, 1997 with Allison Cacace, Director of the Almost Home Day Care Program indicated that the child is adjusting well to the program. At that time the child was attending on Mondays, Wednesdays, and Fridays from 9:00 a.m. to 6:30 p. m. and on Tuesdays and Thursdays from 9:00 a.m. until 5:00 p. m. Ms. Cacace noted that the child needs patience, reassurance and consistency in his routine. It appears as though the child needs socialization and needs to learn how to play. Ms. Cacace also indicated that the child's special needs can be provided for by the child's treatment providers who would be allowed to provide specialized services to Michael while he is attending the program. Since the mother had expressed concern about the child masturbating in her presence, this was addressed with Ms. Cacace. Ms. Cacace indicated that she has not witnessed the child masturbating while attending the program. Ms. Cacace further indicated that the child would be able to attend the four year old program next year. Ms. Cacace also related that the child seems secure in his grandmother's presence and when his father picks him up.
 Elizabeth Carlucci, Social Worker from the Department of Children and Families provided a report dated November 20, 1997. Ms. Carlucci indicated that a recent referral was made alleging physical abuse on the child Michael. Allegations were that Michael had been slapped across the face by his paternal grandmother, Carol Smyrski, and that a scratch had been left on his face. Ms. Carlucci related that she did detect a scratch of approximately 1/2 inch on his left cheek. However, based on her interview with the child on November 18, 1997 Ms. Carlucci was not able to substantiate that this scratch was a result of a slap, nor was she able to substantiate that Mrs. Carol Smyrski had slapped Michael.
The court heard the testimony from Dr. Fox and finds that his observations, conclusions and recommendations are not credible.
In the updated study, Family Relations made the following conclusions and recommendations:
Conclusions and Recommendations
CT Page 5731
 Both the mother and the father continue to express concerns about each other's parenting abilities and this concern seems to be the source of tremendous conflict between the parents and the paternal grandparents. The mother made allegations against the paternal grandparents which were investigated by the Department of Children and Families. The Department found that the mother's concerns about neglect or abuse by the grandparents were unsubstantiated.
 Although both parents seem genuinely concerned about the welfare of the child, it seems as though the concerns felt by both parents are severely straining their communication. The mother was the primary caretaker from the child's birth until the court terminated her visits on August 25, 1997 until November 9, 1997. It is concerning to this writer that the mother was hospitalized on August 28, 1997 reportedly for suicidal ideation subsequent to the termination of the mother's visits. Since the child's birth and since the court terminated the mother's visits, the father has provided a reliable, stable source of support for the child. The father appears to genuinely desire to continue to play a major role in the child's life. The father has also well utilized the consistent support of his parents.
 It appears as though there is reason to be concerned about the mother's judgment at this point in time. There continues to be many serious concerns expressed by the mother as a result of which the mother reportedly terminated the child's visits with the father. As previously indicated, these concerns were unsubstantiated when investigated by the Department of Children and Families.
 At the completion of the previous evaluation completed by Family Services the mother was advised that if there were further problems in her home as a result of which the child was put at risk, that a recommendation of sole custody to the father would be seriously considered.
 It appears as though the child would benefit from continuing contact with both parents. The child's treatment providers had previously indicated that the mother is appropriate in her interactions with the child and has made good use of the resources available to the child. The father had indicated that he is interested in becoming more involved in the child's treatment and has been meeting with the child's speech therapist at his parent's home approximately once a month. It CT Page 5732 would be hoped that the father would continue to meet with the child's speech therapist and that he would maintain contact with the child's other treatment providers.
 It is the recommendation of the Family Services Unit that the father be granted sole custody of the child with the mother visiting with the child in accordance with the following schedule:
 1. Approximately two hours per week in the presence of a Parent Aid provided y the Commission on Child Care, Rights and Abuse depending on the Parent Aid's schedule and an additional ten hours per week on an unsupervised basis.
 2. It is recommended that the mother generally visit on Tuesdays, Thursdays, and Saturdays for approximately four to six hours at a time.
 3. It is recommended that no unrelated persons of the opposite sex be present during the child's visits with either parent.
 4. It is recommended that the child be picked up and dropped off in a public place.
5. It is recommended that the parents alternate holidays.
 6. It is recommended that the mother's visits with the child be contingent upon her compliance with her psychiatric treatment, including taking her prescribed medications.
 7. It is further recommended that the mother's visitation be contingent upon her regular participation in psychotherapy.
 8. It is recommended that the mother sign a release of information for her psychiatrist and her psychotherapist in order to allow her treatment providers to contact Family Services should they develop any concerns about the mother's mental health.
 9. It is recommended that this matter be reviewed by the court in three months.
There are a number of reasons why Family Services has changed its shared custody recommendation in its initial study dated July 16, 1997, to its recommendation of sole custody to the plaintiff CT Page 5733 in its supplemental report dated December 16, 1997. Family Services now believes that the plaintiff can provide a more stable home environment for the child. The reason for this is due to the fact that there has been no emotional neglect by the plaintiff to the child and both he and his parents can provide for the child's emotional needs. This is a special needs child who requires more emotional stability. Family Services also has concern regarding the defendant's emotional stability following her hospitalization between August 25, 1997 and September 16, 1997. Her hospitalization was psychiatric in nature. In October of 1997, the defendant told Family Services that she, the defendant, threatened to kill herself because the child had been taken away from her. Suicidal ideation is the thought of committing suicide. Family Services has further concern about the fact that the defendant made a molestation and child abuse claim against the grandparents through the Department of Children and Families and there was no substantiation for that claim The defendant's allegations against the paternal grandparents are consistent with her diagnosis of being paranoid. Paranoia is where a person feels persecuted and has an unusual distrust of others and is suspicious of others. All of the recommendations by Family Services in its updated study dated December 16, 1997, were for a three month period regarding the defendant's visitation.
The child presently attends school from Tuesday through Friday from 9 a.m. to 11:45 a.m. The plaintiff brings the child to school. The plaintiff agrees that the Burger King on Federal Road, Brookfield, Connecticut is a good location for exchange of the child.
In discussing the test of the best interests of the child, the court in Blake v. Blake, 207 Conn. 217, 224-25 (1988), stated in part as follows:
 In making a determination of custody . . . the trial court is "bound to consider the child's present best interests and not what would have been in her best interests at some previous time." (Emphasis in original.)
The Blake court also cited with approval the case of Yontefv. Yontef, 185 Conn. 275, 283, 440 A.2d 899 (1981). The Yontef
court held in part as follows:
The test is not which parent was the better custodian in CT Page 5734 the past but which is the better custodian now. See, e.g., Trunik v. Trunik, 179 Conn. 287, 290, 426 A.2d 274 (1979); Spicer v. Spicer, supra, 164; Simons v. Simons, supra, 350. Just as we have refused to adopt a conclusive presumption that a mother is always entitled to custody in preference to a father; see, e.g., Simons v. Simons, supra, 350; so also have we rejected any presumption that a parent's life style necessarily has an adverse effect on a child. Gallo v. Gallo, 184 Conn. 36, 42, 440 A.2d 782
(1981). In the exercise of its awesome responsibility to find the most salutary custodial arrangement for the children of divorce, the court must however take account of the parents' past behavior, since it must evaluate their present and future, parenting ability and the consistency of their parenting for the purpose of determining which parent will better foster the children's growth, development and well-being. Seymour v. Seymour, supra, 711.
This court finds that the mother's present emotional state is unstable and that she is therefore presently unable to provide constant and appropriate care for the child.
This court has considered the provisions of § 46b-56 and § 46b-56a in determining the issues of custody, joint custody, and visitation. The court enters the following orders.
ORDERS
1. Custody of the minor child is awarded to the plaintiff.
2. The defendant is awarded the following visitation: (a) Sunday from 10 a.m. to 6 p. m.; (b) Monday from 11 a.m. to 5 p. m.; (c) Wednesday from 12:30 p. m. to 5:30 p. m.; and (d) Thursday from 12:30 p. m. to 5:30 p. m.
3. The parties are to alternate holidays as follows:
 GROUP A GROUP B
New Year's Day Easter Sunday Memorial Day Fourth of July Labor Day Thanksgiving Christmas Eve Christmas Day
In even numbered years, the father shall have Group A, and the mother shall have Group B. In odd numbered years, the father shall have Group B, and the mother shall have Group A, and alternately thereafter. The mother's holiday visitation hours are CT Page 5735 to be from 11 a.m. to 5 p. m. except regarding Christmas Eve for which the hours shall be from 12:30 p. m. to 5:30 p. m.
Notwithstanding the above, the mother shall have visitation on Mother's Day, and there shall be no visitation for the mother on Father's Day.
4. Pick-up and drop-off of the child is to occur at the Burger King on Federal Road in Brookfield, Connecticut. The plaintiff is to make arrangements for the drop-off and pick-up of the child.
5. The defendant is not to allow Barry Profeta to be present at any time when the child is present.
6. The defendant is to comply with all therapy and medication as prescribed by any psychiatrist with whom she may consult. The court is not ordering that she consult and be treated by any psychiatrist.
7. The defendant is to sign a release of information by May 29, 1998, and deliver it to Family Services by that date for a release of information for any psychiatrist and/or psychologist and/or psychotherapist she may treat with in order to allow her treatment providers to contact Family Services should they develop any concerns regarding the defendant's mental health. She is to notify Family Services in writing by May 29, 1998, of the names of all mental health providers who she is currently treating with, and is to further notify Family Services in writing of the names of any new mental health providers she may treat with within ten days from the date such treatment begins.
8. Neither the plaintiff nor the defendant are to use any illegal drugs or any alcohol in the presence of the child, or for twenty-four hours prior to the child being with such party.
9. Neither party is to permanently remove the child from the State of Connecticut.
Axelrod, J.